Filed 9/8/16  P. v. Zambrano CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JULIO ZAMBRANO et al.,<br><br>    Defendants and Appellants. | B262756<br><br>(Los Angeles County<br>Super. Ct. No. BA369032) |

APPEAL from judgments of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Affirmed.

Matthew D. Alger, under appointment by the Court of Appeal, for Defendant and Appellant Julio Zambrano.

Marcia Levine, under appointment by the Court of Appeal, for Defendant and Appellant Abraham Khan.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

Sergio Trejo Hernandez was using a pay phone near a busy Los Angeles intersection when he was killed by a single gunshot to the head. A jury convicted defendants Julio Zambrano and Abraham Khan of committing the murder. (Pen. Code, § 187, subd. (a).)[1] The jury also found true various gang and firearm allegations as to both defendants. (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b), (c), (d), & (e)(1).)

Both defendants appeal from the judgments entered against them. They contend that the trial court deprived them of a fair trial by excluding their proffered evidence of third party culpability. Defendants also argue that the prosecutor improperly relied upon hearsay and facts not in evidence during her rebuttal argument, errors Zambrano further claims were compounded by the trial court's denial of his motions for mistrial and new trial.

We conclude the trial court properly excluded the evidence of third party culpability. We further conclude that the prosecutor did not improperly rely upon hearsay or facts not in evidence, and that even if she did, defendants were not prejudiced. We accordingly affirm.

## PROCEDURAL HISTORY

In an information dated September 1, 2010, the District Attorney of Los Angeles County charged defendants with one count of murder (§ 187, subd. (a)). The information further alleged that defendant Khan personally used (§ 12022.53, subd. (b)) and intentionally discharged a firearm and caused great bodily injury and death to Hernandez (§ 12022.53, subds. (c) & (d)), and that a principal personally used (§ 12022.53, subds. (b) & (e)(1)) and intentionally discharged a firearm and caused great bodily injury and death to Hernandez (§ 12022.53, subds. (c), (d) & (e)(1)). The information also alleged that defendants committed the murder for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)). Defendants pleaded not guilty and denied the allegations.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

After two mistrials, the second of which was occasioned by a deadlocked jury, a third jury found both defendants guilty and found true all of the gang and firearm allegations. The court sentenced each defendant to a total of 50 years to life in state prison, consisting of 25 years to life on the murder count and an additional 25 years to life for the most serious firearm allegation found true as to each of them, section 12022.53, subdivision (d) for Khan, and section 12022.53, subdivisions (d) and (e)(1) for Zambrano. Pursuant to section 654, the court imposed and stayed additional sentences for the remaining firearm allegations. It also struck the gang enhancements because they did not add additional time to defendants' sentences.

Defendants timely appealed.

## FACTUAL BACKGROUND

### I.     Prosecution Case

#### A.     Events Before the Shooting

On the evening of March 3, 2010, 21-year-old James Rios visited his father John Rios's[2] house on Telfair Avenue in the San Fernando Valley. John was associated with the Mid City Stoners street gang. James, who first met his father in 2009, claimed he did not have any gang affiliation. He admitted, however, to having a criminal record, and he testified at trial while in custody and under a grant of immunity.

James and John stood outside the house and talked. James heard music and voices coming from the unattached garage, which he had never entered. Khan exited the garage, and John introduced him to James as Abraham. James described Khan as heavy, with a "[s]haved head, little glasses, little mustache, little goatee, [and] baggy clothes." A second male, whom James identified in court as Zambrano, also exited the garage. John introduced him to James as "Stalker."

James and John remained outside talking, and Khan and Zambrano went back into the garage to "kick it" with two women who were there. Eventually John decided to go inside the house with his girlfriend, Jennifer Collins, at which point Zambrano and Khan

---

[2] We refer to James and John by their first names to avoid confusion.

3

invited James into the garage. James accepted the invitation and stayed in the garage with Zambrano, Khan, and the two women for about an hour, listening to music, talking, and drinking beer.

The two women left, and John joined James, Khan, and Zambrano in the garage. During the ensuing conversation, James learned that Zambrano and Khan were members of the Playboys street gang, and that Khan's gang moniker was "Diablo." James also learned that Zambrano and Khan lived in or at least were staying in the garage, which James testified had been converted into a bedroom and small bathroom.

The topic of conversation eventually shifted to guns. John retrieved a rolled-up blanket from the house. Someone unrolled the blanket onto the floor, revealing approximately five guns. James, John, and Khan "played with" and discussed the guns while Zambrano "was on his phone." Khan also pulled out a "little black and silver" lockbox that contained "an even better gun than the rest of them," a black nine-millimeter Beretta. James did not see anything else in the lockbox.

At the end of the evening, John took the blanket of guns back into the house and Khan returned the Beretta to the lockbox. Khan also asked James if he wanted to do some construction work with him and Zambrano the next day. The construction site was an apartment complex located in "MS's 'hood.'" James knew at the time that MS was a gang. James also understood, from Khan's comment about the MS neighborhood, that MS was probably a rival of the Playboys. John gave his permission for James to go to the construction job, and James spent the night on John's couch.

B.      The Shooting and Immediate Aftermath

1.      James Rios's Testimony

The next morning, March 4, 2010, James, Zambrano, and Khan drove to the Los Angeles construction site in Khan's car, a "[n]icer, newer model" black Cadillac CTS with "[n]ice rims," tinted back windows, and a black leather interior. Khan drove, Zambrano sat in the front passenger seat, and James sat in the back seat behind Zambrano. James noticed the lockbox from the night before lying on the front passenger

4

floorboard near Zambrano's feet. As they traveled, Khan and Zambrano pointed out their gang territory, which James noticed was marked by a lot of graffiti.

James testified that he, Khan, and Zambrano stayed at the worksite until sometime around 5:00 or 6:00 p.m. They left in the black Cadillac. Khan was driving, Zambrano was in the front passenger seat, and James was in the back passenger seat. Less than five minutes into their trip, James saw a Hispanic man talking on a pay phone. James testified that Khan drove the Cadillac a short distance past the man on the pay phone, then pulled the car over and parallel parked it. They did not stop to engage in any conversation with anyone outside the car. James stated that, "Nothing was said as to why we were stopping," and on redirect testified that he "thought it was strange . . . . Just the pulling over, the him getting out, us not knowing why - - or me not knowing why, you know. . . ."

According to James, Khan got out of the car and looked around. James saw that Khan had a "Dodger blue" sweater or hoodie "wrapped around" or "draped over" his left arm. James also testified that Khan was wearing eyeglasses and a hat. Khan closed the door and told Zambrano to move to the driver's seat. As Khan walked away toward the rear of the car, Zambrano jumped over the center console and got into the driver's seat. James asked Zambrano what was going on, but Zambrano was texting and "appeared to be only interested in his phone."

James and Zambrano stayed in the car for what James estimated was "longer than five minutes." Then James heard a pop like a firecracker from behind the car. He began to wonder why the car had pulled over and why they had been sitting there with the engine off. He then saw Khan walking up alongside the passenger side of the car. Khan got in the front passenger seat and told Zambrano, "All right, let's go." Zambrano started the car and pulled away. James testified that Khan was "slightly frantic maybe."

According to James, Khan gave Zambrano directions on where to drive. James testified that Zambrano initially made a left turn. As the car was turning, James saw a police car sitting at a traffic light. James testified that the police car had several people in the back seat. The officer behind the wheel of the police car looked at the black Cadillac as it was turning. Everyone in the Cadillac looked back at the officer, and James "kn[e]w

5

that Stalker and Abraham, the cop, they met eyes." The officer did not pull over or follow the Cadillac.

Khan directed Zambrano to a tattoo shop in an industrial area. The drive took approximately 10 to 15 minutes. Zambrano parked behind the tattoo shop and he, Khan, and James went inside. Zambrano's demeanor remained consistent and he spent most of the time at the shop texting on his phone. Khan, however, "was acting weird," "coming out of the bathroom with, like, his hands dripping wet . . . jumping on his phone, talking to people, just in and out." During an interview with law enforcement, James said that Khan was speaking Spanish on the phone. James testified that Khan seemed to know the people at the shop and asked for a particular artist, a man by the name of Cartoon. Cartoon was not around. James, Zambrano, and Khan waited around the tattoo shop for Cartoon because Khan wanted to get tattooed by Cartoon and no one else. Cartoon never arrived, and James, Zambrano, and Khan left the shop at around 9:30 or 10:00 p.m.

Khan drove the trio back to John's house. On the way there, James heard Zambrano ask what had happened. James also heard Khan say that he had shot somebody. James did not believe at that time that Khan had shot someone because he did not see it with his own eyes, and because they had been on a busy street in broad daylight.

When James, Khan, and Zambrano arrived at John's house, John was outside. James wanted to talk to his father about the evening's events, but Khan asked John if he could talk to him about something. Zambrano went into the garage, and James waited outside while John and Khan spoke inside the house for more than five minutes. When they came out, John said to James, "Well, son, you had a good day at work, huh?" James and John went into the house, and Khan and Zambrano left in the black Cadillac. James again spent the night on John's couch.

Zambrano and Khan returned the next morning in a gold car that James said "kind of looked the same as the black one, but it was a different color and the interior was different." James described the gold car as a "school mom type of car," devoid of "special rims" and a "special interior." James asked them if he could have a ride to his

6

grandfather's house in Canoga Park. Khan drove James and Zambrano to Canoga Park in the gold car. When they arrived at James's grandfather's house, Khan said, "Now we know where you live." James recalled "looking back at Stalker and he was just, like, you know, what the fuck, you know."

## 2. Testimony of Other Witnesses

Maria Sanchez testified that she was in a long-term relationship with Sergio Hernandez. Hernandez was not a gang member and did not fraternize with gang members. He and Sanchez had a child together and lived in Los Angeles, approximately one block from the intersection of James M. Wood Boulevard and Westmoreland Avenue. Hernandez took the bus to and from work and typically called Sanchez from a pay phone on his way home. On March 4, 2010, Hernandez called Sanchez and told her he was on his way to meet her. After Sanchez hung up, she heard a gunshot. She became worried because she heard ambulances and Hernandez had not arrived home yet. She went outside to see what was going on and saw Hernandez lying on the ground.

Jose Monterrosa was walking along James M. Wood toward Westmoreland at around 5:15 p.m. on March 4, 2010. He was listening to music on headphones but could still hear his surroundings. As Monterrosa approached the 7-Eleven convenience store on the corner of James M. Wood and Westmoreland, he saw a black Cadillac CTS with chrome rims "cruising" by him slowly. As the car passed, he heard the front passenger in the car say "Where you from?," which he recognized as "gangster terms." Monterrosa described the front passenger as an Hispanic male wearing a blue Dodgers hat, a black shirt, and sunglasses. He could not see the driver and could not see into the back seat of the car. Monterrosa turned around and began walking in the other direction, toward Hoover Street. He then ran down a driveway and hid behind a tree because he was afraid for his life.

From his vantage point behind the tree, Monterrosa saw the black Cadillac make a U-turn and park in front of a driveway. The driver's side window was down, and Monterrosa was able to see that the driver was a "skinny" Hispanic male. He could not see into the back seat because the tinted windows were up. Monterrosa saw the front

7

passenger—the same person who had asked where he was from—get out of the car. Monterrosa noted that the passenger was "a little stocky" and had a white shirt covering his hand. Monterrosa lost sight of the passenger as he walked toward the corner "where there's a phone booth," the corner diagonally across or catty-corner from the 7-Eleven. He noticed that the driver of the car "seem[ed] kind of nervous looking in the rearview mirror," "kind of leaning," not looking "like a regular person."

Monterrosa "knew something was going to happen," so he started to walk toward his grandmother's house on James M. Wood with the intention of going inside. Shortly thereafter, Monterrosa heard a gunshot. He ran faster and went inside his grandmother's house. Once inside, he saw the passenger run back to the black Cadillac and get in the front passenger seat. The car drove off toward Hoover Street at a normal rate of speed. As it drove away, Monterrosa took a "memory picture" of the car. At trial, he recalled seeing a Cadillac emblem and a CTS emblem on the back of the "black model, four-door CTS Cadillac, [with] chrome rims, [and] black tinted windows from the back." Monterrosa also recalled that one of the people in the car had a facial tattoo beneath his eyelid, but could not remember whether it was the passenger or driver.

Another witness, Jacquelyn Contreras, lived in a second-floor apartment on James M. Wood Boulevard. Around 5:15 p.m. on March 4, 2010, she was watching television with her mother. She heard a gunshot outside and walked to the window. The first thing that caught her eye was a car parked in front of a driveway across the street. The car was black, with tinted windows and shiny silver rims. She saw hands on the steering wheel but could not see the driver's face or anything else within the car. Contreras also saw a "guy running towards the car," from the direction of Westmoreland. The man, whom Contreras thought was Latino, was "a little chunky." He was wearing a hoodie and carrying a gun, which he stuffed into his waistband. Contreras saw him get into the front passenger seat of the black car. The car drove away toward Hoover Street.

Los Angeles Police Department (LAPD) Officer Allan Corrales testified that he was transporting three witnesses from court to the Olympic Division police station in the back of his police cruiser on the evening of March 4, 2010. He was driving south on

8

Hoover, through MS-13 gang territory, when he stopped at a red light at the intersection of Hoover and James M. Wood. While Corrales was waiting at the traffic light, a black vehicle with shiny chrome rims caught his attention. Corrales watched the vehicle as it made a left turn from James M. Wood onto northbound Hoover. Corrales made eye contact with the driver as the vehicle passed within 12-14 feet of him. He described the driver as an Hispanic male with a teardrop tattoo under his left eye. Corrales identified the driver in a photo array and in court as Zambrano. Corrales could not see the front passenger because the seat was reclined; he saw only "a silhouette leaning back." He could not see into the back seat because the tinted windows were up.

Shortly after the car passed, Corrales received a radio call reporting a shooting near the intersection of James M. Wood and Westmoreland. Corrales "transmitted over the radio to let the other officers know that [he] had seen a black vehicle traveling northbound on Hoover from James M. Wood" but did not document his sighting of the black car in a report or log. After he dropped off his civilian passengers, Corrales drove back up Hoover to where he had seen the black car. He drove around the area, but did not see the car anywhere. Corrales then went to the scene of the shooting to assist the officers who had responded to the radio call.

LAPD Officer Josh McDonald was among those responders. McDonald testified that the intersection of James M. Wood and Westmoreland was "kind of mixed use between residential and business." There was a 7-Eleven on the northwest corner, residential buildings on the northeast corner, and small businesses including an ice cream shop and clothing store on the southern corners. The southeast corner also housed a pay phone. McDonald found a male lying on his back next to the pay phone. Based on the blood coming from the man's nose and ears, and his swollen temple, McDonald concluded that the victim had suffered some sort of head wound. McDonald did not observe any other injuries on the victim's body. He saw a spent casing from a gun lying on the ground near him.

LAPD Detective George Lee took control of the investigation when he arrived on the scene. He marked the single bullet casing as evidence. Lee testified at trial that the

9

casing came from a nine-millimeter semiautomatic weapon. Lee further testified that he spoke to Jose Monterrosa on the night of March 4, 2010. During that interview, Lee received a call that police had located a car that matched the description of the one seen fleeing the murder scene. Lee drove Monterrosa and his parents to the location of that car, approximately a mile or two from the crime scene. Monterrosa told Lee the car was very similar to the one he had seen; according to Monterrosa, it was the same color and same model as the car he had seen, and had black tinted windows and chrome rims. Further investigation revealed that the car was not the one used during the crime.

Deputy medical examiner Dr. Juan Carrillo performed an autopsy on Hernandez on March 5, 2010. He found a "hole defect" in the back of Hernandez's head that was surrounded by dark abrasions known as "stippling." Carrillo testified that the stippling indicated that Hernandez was shot at a close range of about two to three feet. Inside Hernandez's brain, Carrillo found lead and copper fragments consistent with a bullet. Carrillo concluded that Hernandez died instantly from a single gunshot to the head. Carrillo testified that the manner of death was homicide.

### C.     Investigation

On March 5, 2010, the day after the shooting, Detective Lee sent a "crime bulletin" about it to the entire LAPD. According to Lee, crime bulletins apprise other officers of information such as a suspect or vehicle, and allow them to "see if they can come up with something."

Officers in the Hollywood Division of the LAPD happened to be conducting an unrelated investigation of Khan and Zambrano. One of those officers, Detective Lance Jurado, testified that he and his team obtained a search warrant for "narcotics and firearms" believed to be associated with residents of a garage on Telfair Avenue—John Rios's garage. On March 9, 2010, one of the officers surveilling the home informed Jurado that two men had arrived in a gold Cadillac and gone inside the garage. Jurado knew that Khan was connected to a gold Cadillac, so he deployed his team to execute the search warrant.

10

The search team, including Detective Fruit,[3] knocked on the door of the main house, announced "Los Angeles Police Department," and demanded entry. John Rios and Jennifer Collins came out of the house and were detained.[4] Khan and Zambrano were found hiding in the bathroom of the garage. Officers did not find any guns in the garage, but they recovered a "small amount of marijuana, handgun magazine with ammunition in it, and some items identifying people who lived in the garage." Police also found approximately 24 nine-millimeter bullets in the garage. They seized five guns from the main house. Those guns were not wrapped in a blanket or contained in a lockbox, and none of them was a nine-millimeter Beretta.

On or about March 10, 2010, Detective Fruit from the Telfair Avenue search team informed Detective Lee that "they had someone, in particular, Mr. Khan, Abraham Khan, who was driving a similar vehicle to that of the vehicle that [he] was looking at." Lee did a "work-up" of Khan and learned that a black Cadillac CTS was registered in Khan's name. Detective Ernesto Ignacio, Lee's partner, went to the Hollywood Division station and spoke to officers involved with the Khan and Zambrano narcotics and firearms investigation. Ignacio became "confident" that the two investigations were related. He obtained photographs of Khan, Zambrano, and John and put them into six-pack photo arrays. Because he was concerned that Khan, Zambrano, and John might post bail—which Khan and John in fact did—Ignacio immediately took the photo arrays to Monterrosa and Contreras. Both Monterrosa and Contreras circled the photograph of Khan, which Monterrosa said resembled the passenger in the black car he had seen and

---

[3] The record does not contain Detective Fruit's first name.

[4] James testified that he subsequently received numerous phone calls from Collins. When he returned her calls, "[s]he was, like, hysterical, crying. She said she was at the police station, that they arrested my dad and that they were asking her a bunch of questions about what happened on this and this day and things like that." James testified "[t]hat's when [he] realized what had actually happened" on March 4. James later told John "everything that had happened that day from beginning to end" but left for Oregon without speaking to the police. Law enforcement personnel, including the prosecutor, traveled to Oregon and spoke to James for the first time in June 2013. James, who was in custody, agreed to speak to them only after they transported him to Los Angeles and let him speak to John. James identified Khan and Zambrano in photo arrays.

11

Contreras said resembled the person she had seen outside of the car. Monterrosa was not able to identify Khan in court. According to Ignacio, Khan "looked completely different" at trial than he did at the time of his arrest: "[h]e lost a substantial amount of weight, grew out his hair."

After obtaining positive identifications of Khan, Ignacio sent surveillance teams to John's house on Telfair Avenue and to the address in Monrovia at which the gold Cadillac was registered. Khan's uncle, John Blanco, lived at the Monrovia address. Blanco testified at trial that the owner of the house had a "goldish or champagne-colored" Cadillac. According to Blanco, he loaned the gold Cadillac to Khan on March 8, 2010, and Khan left the black Cadillac at the Monrovia residence.

Ignacio's surveillance team reported that a black Cadillac was parked at the Monrovia residence. Ignacio obtained search warrants for both John's house and the Monrovia residence. Both warrants were executed on March 11, 2010. Ignacio participated in the Monrovia search and impounded the black Cadillac. The vehicle was searched for evidentiary items but none was found. No usable fingerprints were recovered from the vehicle.

On March 12, 2010, Lee interviewed Blanco. That same day, Lee received information that "someone was removing property at the Telfair address that belonged to Mr. Khan." Lee went to John's house and saw the gold Cadillac leaving the location. Lee stopped the vehicle. Another detective searched the car and found Khan's passport. Ignacio testified that unspecified "property" belonging to Khan and "some money" were found as well. Lee took the occupants of the car, Jose Villa and Patricia Valle, to the Olympic Division police station. Lee learned that Villa and Valle "were in constant contact" with Khan via cell phone. Lee obtained a telephone number associated with Khan and discovered that the number was connected to a residence in Orange County.

Lee and Ignacio obtained a search warrant for the Orange County residence, which was occupied by Khan's relatives. On March 13, 2010, he and other officers executed the search warrant and arrested Khan, who had posted bail and was present. Officers also recovered a computer bag containing a laptop, a cell phone, and some thumb drives, all of

12

which were found in a bedroom that LAPD Detective Dennis Bopp testified "was described by the aunt as being Mr. Khan's room." The officers booked those items into evidence.

LAPD computer crimes officer Maurice Kwon analyzed the computer, cell phone, and thumb drives. His analysis revealed that the computer's password-protected user account belonged to "Abraham." Kwon found 702 internet searches relating to the Playboys gang on that account. The searches were conducted between January 22, 2010 and February 6, 2010. He also found "a number of searches relating to murders or homicides," and a query for "recent shootings in Los Angeles." In addition, Kwon recovered approximately 160 to 170 images "possibly related to gangs or gang members or gang paraphernalia," and an article "bookmarked in relation to the keyword Playboy." The undated article, which was last accessed on January 18, 2010, contained a sentence concerning a deceased Playboys member named Lucky: "He mentioned Lucky, one of the dead Playboys, who was shot and killed on a street corner last summer while talking on a pay phone." From one of the thumb drives, Kwon recovered a folder called "[H]omies" that contained gang photographs and other images that had been deleted on March 5, 2010 or shortly thereafter.

### D. Relevant Gang Evidence

LAPD officer Juan Del Rio testified as a gang expert. He was familiar with the Playboys gang and its rivals, including Mara Salvatrucha, which is also known as "MS" or "MS-13." Both the Playboys and MS had territories within the Olympic Division in 2010. The Playboys' territory was bounded by Olympic Boulevard to the north, Vermont Avenue to the east, Venice Boulevard to the south, and Normandie Avenue to the west. This territory bordered territory claimed by MS, which included the intersection of James M. Wood and Westmoreland.

Del Rio opined that the Playboys was a criminal street gang whose primary activities included graffiti, grand theft auto, carjacking, possessing firearms and narcotics, and committing assaults, batteries, and shootings. The Playboys gang had approximately 80 documented members in 2010. Members commonly wore clothing with the letter P or

13

bunnies on it. Del Rio also testified that they wore "Dodger blue" and used a hand signal that evoked the shape of the Playboy bunny logo.

Del Rio testified that it was common for Playboys members to paint graffiti both inside and outside their territory. The court admitted an exhibit depicting some Playboys graffiti. According to Del Rio, "you can see the words [*sic*] Playboys behind the two individuals that are depicted in the photograph. Above it, Lucky Bird." Del Rio was not familiar with Lucky Bird, but testified that "usually when a group of gang members will do a graffiti like that, everyone that's present at the time when it's done, they will write their monikers. We call that a roll call." Del Rio noted that "[a]t the bottom right of the Playboys . . . it says *Muerto*. That's another moniker."

According to Del Rio, it is common for gang members to get tattoos declaring their allegiance to their gang or "trophy tattoos" commemorating incidents of criminal behavior. Khan had numerous tattoos related to the Playboys gang, and admitted his gang membership to officers when he was arrested in 2000 and 2001. Zambrano admitted his Playboys membership during previous arrests dating back to 2000 and had numerous Playboys-related tattoos, including the words "Lucky" on his left arm and "Bird" on his right. Zambrano also had teardrop tattoos under his left eye. Del Rio opined that Khan and Zambrano were members of the Playboys gang in 2010. Del Rio testified that Khan's monikers were "Diablo" and "Termite," and Zambrano's moniker was "Stalker."

Del Rio testified that it is common for gang members to commit crimes with fellow gang members. He explained that there were several reasons why gang members tend to commit crimes in groups: "for security purposes[,] to show force and also to validate their work so they can go back to their fellow gang members and . . . . [h]ave someone that can corroborate that." One of the activities common to predominantly Hispanic gangs like the Playboys is "hitting someone up or asking, 'Where are you from?'" According to Del Rio, "if you have a gang member from Playboys that tells another person, 'Where you from?' if it's a rival gang, as soon as they hear that rival name, sometimes that will ensue in a fight or a shooting or a stabbing." Even if the gang

14

member does not get a response to this query, "they will see that as a form of disrespect" and "will still inflict violence on that other person." Thus, there is an "expectation that violence is going to follow" when someone is "hit up." Del Rio noted that individuals who are not gang members sometimes get caught up in the violence.

According to Del Rio, gang members generally know the boundaries "of their territories and also the territories where their enemies's [*sic*] territories begin. So when they cross that line, they're exposing themselves to be, one, victimized by the rival gang, and also to start a gang feud." Del Rio testified that the Playboys and MS "have been feuding for years," and Playboys members frequently go into rival gang areas and shoot rival gang members when they are feuding with a particular gang. He opined that a Playboys gang member would gain elevated status within the gang if he went into rival MS territory and committed a shooting. When given a hypothetical mirroring the evidence presented at trial, Del Rio opined that the shooting would have been committed for the benefit of the shooter's gang.

## II.    Defense Case

Khan called several witnesses to testify in his defense. Zambrano did not call any witnesses.

Jayme Licuanan, a retired federal narcotics agent and police officer, testified that he was driving west on James M. Wood near Westmoreland around 5:15 p.m. on March 4, 2010. While he was stopped at a red traffic light, Licuanan looked around and noticed a young man on a pay phone, which he thought was "strange" in light of the proliferation of cell phones. He then saw a Latino male who was a "little heavy, maybe" get out of a car. He had a jacket hanging on his left hand. Licuanan testified that the man with the jacket approached the man on the pay phone and stopped about eight to 10 inches away. Licuanan looked away. He then heard a gunshot and saw the man on the pay phone fall to the ground. The man with the jacket walked away briskly and got into a black car. Licuanan described the black car as a "new Honda car" with "unusual rims" that were "nice" and "clean." Licuanan was unable to get the car's license plate number. He also was unable to identify a suspect when a detective showed him a six-pack photo array.

15

Doris Chaney, the tutorial coordinator at California State University, Northridge, testified that she met Khan when he started attending school on an engineering scholarship in 2006 and hired him as a tutor in 2009. Khan tutored at-risk students for 20 hours per week. He also served as secretary of the engineering honor society and helped mentor students who were struggling with addiction. In Chaney's opinion, Khan was peaceful and nonviolent. She conceded on cross-examination that Khan had gang-related tattoos, but testified that he did not look like a gang member and "was trying to do something with his life."

Retired LAPD Officer Steven Strong appeared as a gang expert for the defense. He testified that the number of gang tattoos a person has is not necessarily correlated with the level of violence in which that person engages. Strong also testified that he has seen teardrop tattoos on people who are not gang members. Strong further testified that a person may have a gang tattoo but may no longer be associated with a gang. Strong opined that a gang member who has not been identified on a field identification card for eight years and has been attending college during much of that time is probably no longer an active gang member.

Linda Barrera lived with Khan's uncle John Blanco in Monrovia. Barrera testified that Khan stayed at their home on March 7, 2010. His black car was not there before March 7, 2010. At that time, Khan's head was shaved and he had a mustache.

Private investigator Lawrence DeLosh took photographs from Contreras's and Monterrosa's reported viewpoints. Those photographs were admitted into evidence.

Khan's mother, Rosalinda Khan, testified that Khan was left-handed. She had never heard him speak Spanish.

## DISCUSSION

Khan and Zambrano advanced competing theories at trial—Khan's defense was one of mistaken identity, while Zambrano' s was that he was merely present and did not know that Khan intended to murder Hernandez. On appeal, however, defendants raise essentially the same claims: they contend the court erroneously refused to admit evidence

of third party culpability, and the prosecutor committed prejudicial error by making improper arguments. We consider these contentions in turn.

## I. Third Party Culpability

### A. Background

Prior to trial, Khan's counsel informed the court that he wished to call Ricardo Cabral as a witness. Zambrano's counsel later joined the request. Khan's counsel told the trial court, "Cabral testified under oath that he overheard Roberto Ceron bragging about committing this murder to another individual, not directly speaking to Mr. Cabral." The court stated that it would "have to hear more than what's being purported at this time in the offer of proof before I allow that testimony to come in." The court further explained that "there has to be something connecting that person to the crime" and it had not "heard anything at this point that establishes sufficient nexus to do that."

During trial, Khan's counsel provided the court with a transcript of testimony Cabral gave in an unrelated murder case that was tried in 2012, *People v. Martinez*, No. BA361721-01. According to that transcript, which was included in the record on appeal, Cabral was a member of the Villa Boys gang who was serving a sentence for burglary. He previously had been arrested for "going into cars, trying to steal purses" but was sentenced to probation and released after providing information regarding Martinez. Specifically, Cabral testified that Martinez was his friend and told him that "he had dropped somebody on Sixth and - - I think 6th and Berendo," or "6th and Vermont." That area was near Cabral's mother's house, which he testified was within MS gang territory near "Berendo and 8th." According to Cabral, Martinez often wore hats and shaved his mustache after the murder.

Cabral testified that he subsequently was arrested in March 2010 and held in custody "for a few days" for second degree burglary. He testified that he was released after providing "information on another murder," i.e., *not* the one Martinez allegedly

17

committed at Sixth and Berendo. [5]  According to Cabral, he told the police that "[s]ome other guy told me about another murder," or, as Martinez's counsel put it on cross, "someone from Mara Salvatrucha . . . did a shooting at the 7-Eleven" in which the victim "got shot behind the head."  Cabral could not remember the alleged perpetrator's name on direct examination, even when the prosecutor mentioned the name Roberto Ceron, but remembered that the shooter belonged to MS.  On cross-examination, however, Cabral agreed that he "told officers that Robert [*sic*] Ceron, the guy from Mara Salvatrucha," told someone else about the murder.  Cabral agreed to wear a wire and "went to go talk to that guy."  His efforts to elicit a taped confession proved fruitless, however, because the man "wasn't really saying nothing."  The police released Cabral after this attempt, but rearrested him in November 2010.  He ultimately was sentenced to four years for the burglary and was serving that sentence at the time of the Martinez trial.

The trial court reviewed the transcript and accurately summarized it as follows: "So it's clear, what this involves is the witness testifying as to one murder and he is subsequently arrested and released shortly after his arrest in March of 2010 and he claims that somebody told - - and the reason he was released because was [*sic*] he got information on a second murder.  So he got a deal on the first case, got picked up on a second case, and got released on that case in March, put on a wire to go talk to this guy to get back to - - to see if they could confirm any of the information that he had given him on this supposedly second homicide, and he got nothing."  The court opined that "there's a paucity of facts relating to that particular incident and nothing that would connect it to

---

[5] The parties conflate the two murders about which Cabral testified. Zambrano (whose argument Khan joins) represents that Khan "sought to present evidence that someone named Roberto Ceron, aka Raul Martinez, had claimed responsibility for the murder in this case," and states that Cabral "testified that he overheard Raul Martinez, an MS gang member, say that he shot someone in the back of the head in March 2010, at a 7-Eleven store located at 6th and Berendo streets."  Respondent similarly refers to the third party as "Robert [sic] Ceron, aka Raul Martinez."  These assertions are not supported by the transcript of Cabral's testimony, which does not indicate that Martinez has an alias and refers to two distinct murders: one allegedly committed by Martinez in August 2009, and another allegedly committed by a person named Ceron, sometime prior to Cabral's arrest in March 2010.

18

the shooting that took place on the corner of James M. Wood and Westmoreland." The court ruled that this evidence did not directly or circumstantially link the third party to the crime and that the probative value of the evidence was outweighed by "the confusion it could cause by introducing this evidence."

## B. Legal Principles

Any "relevant evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that a party other than the defendant committed the offense charged," is admissible. (*People v. Hall* (1986) 41 Cal.3d 826, 829 (*Hall*).) "To be admissible, the third party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (*Id.* at p. 833.) However, "we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability." (*Ibid.*) "[E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid.*) Similarly, evidence that another person "had some 'remote' connection to the victim or the crime scene, is not sufficient to raise the requisite reasonable doubt." (*People v. DePriest* (2007) 42 Cal.4th 1, 43.)

The proper inquiry for trial courts to make when considering the admissibility of third party culpability evidence is "limited to whether this evidence could raise a reasonable doubt as to defendant's guilt and then applying [Evidence Code] section 352." (*Hall*, *supra*, 41 Cal.3d at p. 833.) That is, "courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion." (*Id.* at p. 834.) Courts should not reject proffered evidence of third party culpability on the basis of its credibility; "[s]uch a determination is properly the province of the jury." (*Ibid.*)

"A trial court's ruling excluding third party culpability evidence is reviewed for abuse of discretion." (*People v. Elliott* (2012) 53 Cal.4th 535, 581.) Likewise, we

19

review the trial court's rulings on the relevance of evidence and its exclusion under Evidence Code section 352 for abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 577; *People v. Lewis* (2001) 26 Cal.4th 334, 373.)

### C. Analysis

Defendants argue that the trial court abused its discretion by considering Cabral's credibility, by concluding that there "was insufficient evidence to connect Martinez/Ceron's admission to the murder in this case," and by concluding that the potential for confusion outweighed the probative value of his testimony. Defendants also claim that the exclusion of the evidence violated their right to a fair trial. None of these contentions is persuasive.

First, nothing in the record indicates that the court evaluated the credibility of Cabral's testimony. Defendants assert that the court "evidently" did, by commenting that Cabral "got nothing" from the alleged perpetrator when he wore the wire. We disagree. That statement plainly was part of the trial court's summation of the proffered evidence. The trial court did not suggest that Cabral's testimony was incredible because he could not elicit a confirmatory confession from the alleged perpetrator; it simply noted the sequence of pertinent events documented in the transcript. We note further that the court made no comments even alluding to classic hallmarks of credibility, such as Cabral's criminal record, the lapse of time between the murders and his testimony, or his inability to recall names and details.

Second, the court's conclusion that there was "a paucity of facts relating to that particular incident and nothing that would connect it to the shooting that took place on the corner of James M. Wood and Westmoreland" was not an unreasonable or arbitrary one. According to Cabral, "someone from Mara Salvatrucha . . . did a shooting at the 7-Eleven" in which the victim "got shot behind the head." This testimony at best describes events vaguely similar to those at issue in this case; it does little to link a third person to the actual perpetration of the Hernandez murder. Construed generously, Cabral's testimony described a victim who was shot "behind the head" by MS member Roberto Ceron "at the 7-Eleven." Cabral offered no further details, such as the number of shots

20

fired, the type of weapon used, the approximate date, or the gang territory or general location in which the shooting occurred that would suggest the second murder he had heard about was the murder at issue in this case.[6]  Absent these sorts of details, Cabral's skeletal testimony did not tend to raise a reasonable doubt about defendants' involvement in the murder of Hernandez at a pay phone catty-corner from a 7-Eleven.  The trial court accordingly did not abuse its discretion in excluding the evidence on this basis.

Finally, the court reasonably concluded that the potential for confusion substantially outweighed any probative value Cabral's testimony might have had. Defendants suggest that the "only potential for confusion was that the informant's testimony might cause the jury to believe the wrong person had shot Hernandez," but this circular suggestion is not persuasive.  Many aspects of Cabral's testimony were potentially confusing.  Cabral had difficulty recalling the name of the alleged shooter and said nothing about the date or general location of the shooting.  He said only that the shooting was "at the 7-Eleven," while the shooting in this case was diagonally across the street from a convenience store.  Indeed, attorneys familiar with the entirety of Cabral's testimony have conflated his description of two distinct murders into a single murder committed by a perpetrator named "Martinez/Ceron" who changed his appearance afterward.  It was not an abuse of discretion for the court to conclude that a jury composed of laypeople similarly might have become confused.

In light of our conclusion that the trial court did not abuse its discretion in determining that the proffered evidence was inadmissible under Evidence Code section 352, it necessarily follows that the court did not violate defendants' constitutional rights by excluding the evidence.  "As a general matter, the ordinary rules of evidence do not

---

[6] We reiterate that Cabral explicitly described two separate murders.  One of those murders, the one allegedly committed by Martinez in 2009, occurred at or near the intersection of Sixth and Berendo and was followed by a change in Martinez's appearance.  The second murder, the one allegedly committed by Roberto Ceron, a member of Mara Salvatrucha, occurred at some unspecified point in time "at the 7-Eleven" in some unspecified location.

impermissibly infringe on the accused's right to present a defense." (*Hall*, *supra*, 41 Cal.3d at p. 834.)

## II.     Prosecutorial Misconduct

Defendants contend the prosecutor committed prejudicial misconduct during her rebuttal argument, and the trial court erred in failing to grant a mistrial or new trial to rectify the prejudice.

### A.     Legal Principles

Prosecutors are afforded wide latitude to draw inferences from the evidence presented at trial. (*People v. Hill* (1998) 17 Cal.4th 800, 823.) Likewise, they are permitted to make "'a wide range of descriptive comment'" on the evidence and may vigorously argue that reasonable inferences or deductions should be drawn therefrom. (*People v. Martinez* (2010) 47 Cal.4th 911, 957.) Prosecutors also may state matters that are common knowledge or are drawn from common experience, history, or literature (*People v. Wharton* (1991) 53 Cal.3d 522, 567), and are permitted to fairly respond in rebuttal to arguments made by defense counsel (*People v. Reyes* (2016) 246 Cal.App.4th 62, 74). However, these allowances do not excuse misstatements of fact, whether deliberate or mistaken. (*Hill*, *supra*, 17 Cal.4th at p. 823.) It is equally impermissible for prosecutors to mischaracterize evidence (*ibid.*), to elicit evidence in violation of a ruling by the trial court, or to refer during opening statement or closing argument to evidence the trial court has deemed inadmissible (*People v. Crew* (2003) 31 Cal.4th 822, 839).

"'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant[s'] claims are, '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'" (*People v. Gonzales* (2011) 52 Cal.4th 254,

22

305.) "Because we consider the effect of the prosecutor's action on the defendant, a determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct." (*People v. Crew*, *supra*, 31 Cal.4th at p. 839.) "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*Ibid.*)

We review the trial court's rulings on prosecutorial misconduct for abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 792-793 (*Peoples*).) We also review for abuse of discretion the trial court's rulings on motions for mistrial and new trial. (*People v. Ayala* (2000) 23 Cal.4th 225, 283 [mistrial]; *People v. Ault* (2004) 33 Cal.4th 1250, 1260 [new trial].) "A trial judge is in a better position than is an appellate court to determine the probable effect of [the prosecutor] and his [or her] conclusion on that question will not be disturbed by an appellate court unless in the circumstances it is plainly wrong." (*People v. Sarazzawski* (1945) 27 Cal.2d 7, 15, overruled on another ground by *People v. Braxton* (2004) 34 Cal.4th 798, 817.)

## B.    Timeliness of Objections

Respondent contends defendants have failed to preserve their claims of prosecutorial misconduct for appeal because they did not object to the prosecutor's rebuttal argument during the argument. By holding any objection until the conclusion of the prosecutor's argument, when the jury was dismissed for lunch, respondent contends, defendants waited too long. We disagree.

"To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument." (*People v. Gonzales*, *supra*, 52 Cal.4th at 305.) As a general rule, a defendant alleging prosecutorial misconduct must object specifically and contemporaneously. (See *Peoples*, *supra*, 62 Cal.4th at p. 801.) The reason for this rule is to give the trial court an opportunity to correct any errors by admonishing the jury. (*Ibid.*) Thus, a post-verdict motion for a new trial is not sufficient to preserve a claim of prosecutorial misconduct for statements made during closing arguments (*ibid.*, citing

23

*People v. Adams* (2014) 60 Cal.4th 541, 577), but an objection made after an extended colloquy may be (*ibid.*, citing *People v. Collins* (2010) 49 Cal.4th 175, 225).  A claim of prosecutorial misconduct during closing argument also may be preserved if presented in a motion for mistrial made while proceedings were still ongoing.  (*Peoples*, *supra*, 62 Cal.4th at pp. 800-801.)

Here, defendants objected at the conclusion of the prosecutor's rebuttal argument, while the jury was at lunch and before it began deliberating.  The timing of their objections, while perhaps not ideal, nonetheless "provided the trial court with an opportunity to admonish the jury prior to the start of deliberations."  (*Peoples*, *supra*, 62 Cal.4th at p. 801.)  "Moreover, defendant[s'] objections were specific enough for the trial court to craft suitable corrective instructions."  (*Ibid.*)  Just as the defendant's motion for mistrial preserved his claim of misconduct in *Peoples*, defendants' objections at the conclusion of rebuttal argument were "alleged in time for the court to instruct the jury and correct any error."  (*Ibid.*)  The purpose of the rule was served and we therefore conclude the objections were timely.

### C.    Packed Suitcases

#### 1.    Background

During her initial closing argument, the prosecutor suggested that Khan attempted to evade capture after murdering Hernandez.  In support of this argument, she pointed to evidence that Villa and Valle were apprehended after leaving the Telfair Avenue residence in a gold Cadillac with "some of Khan's property."  She further argued that "you don't see many of [Khan's] belongings" in photographs taken during the search of the Orange County residence, because "he needed to get out of town quite quickly."  The prosecutor also noted that Khan changed his appearance by shaving his facial hair.

Khan's attorney responded to this argument during his closing argument.  While suggesting to the jury that there was no evidence of flight, counsel stated:  "You heard about a passport and then you heard one of the detectives saying that, oh, well, we were afraid he was going to leave the country. . . .  [I]s anybody going to leave a passport in a place that you have vacated?  But since Mr. Villa is a friend of his and he's in

24

photographs, there's some basis for believing that that is flight?  And questions by [Zambrano's counsel] on direct or on cross-examination at one point in time, there was no packed suitcases.  No toothbrushes.  No stashes of money.  No disguises."

Zambrano also called into question the evidence of Khan's flight during his argument.  "I love this one. Mr. Khan packed his suitcase.  He was fleeing the country.  We heard that from two witnesses.  Right?  And I'm thinking to myself, wow, that sounds bad. Someone fleeing the country.  They pack up their suitcase.  They put their extra glasses in, for prescription glasses.  They put their toothbrush in.  They put their whatever you're going to pack that you need to pack.  . . .  When I say toothbrush, you know I'm being a little facetious about that. But where's this evidence, ladies and gentlemen? You heard it twice. And they back-peddled [*sic*] both times because they're fudging this case.  . . .  Where is that evidence?  Where is any evidence that there was a box, there was clothes?  There's nothing, ladies and gentlemen.  Again, they got caught on that because it sounded good.  Oh, he was going to flee the country.  Sounds great.  Right?  Come on.  Really?"

On rebuttal, the prosecutor returned to the issue of Khan's flight.  She asked the jury, "You want to know what the evidence is of this man's fleeing? *The two bags that are packed in his bedroom.*  Okay?  I mean, I almost have to laugh. Because they're up there really trying to get all of you to believe that this guy is not going to flee.  'Where's the luggage? *Where are his bags being packed*?'  Well, counsel, if you had looked at the evidence, *you would see they're sitting in his bedroom*.  Okay?  Along with his computer, along with his jump drive, along with some cell phones."  (Emphases added)

Exhibit 49, to which the prosecutor was alluding, is a photograph of a bedroom— the bedroom that Detective Bopp testified "was described by the aunt as being Mr. Khan's room" and from which Khan's laptop and thumb drives were obtained.  In the foreground of the photograph, there are two soft-sided suitcases.  The suitcases are upright and closed.

Khan objected to and moved for a mistrial and new trial based on the prosecutor's comments at the conclusion of her rebuttal argument.  He contended her argument was

25

improper because the two pieces of luggage in the photograph were "totally unidentified, never testified to [*sic*] about to lay any particular foundation that they belonged to Mr. Khan or that anything else in that room belonged to Mr. Khan." Zambrano did not join the objection or motion for mistrial on these grounds, though he later joined Khan's motion to continue sentencing to enable defense counsel to obtain further information about the suitcases.[7]

The trial court overruled the objection and denied the posttrial motions. When considering the objection, the court stated that it "allow[s] wide latitude to both sides to argue reasonable inferences," and ruled that the comments about the suitcases "fall[] in that category." In discussing the posttrial motions, the court stated that the prosecutor's comment "didn't go to the underlying issues of the case. It went to the question of whether there was evidence of flight . . . . I think it was a comment, even if it was improper, in light of all the evidence related to flight, it's just not - - it was tangential at best." The trial court ruled that the comment was not improper, and would not warrant a new trial even if it had been.

### 2. Analysis

Khan argues that the prosecutor argued facts not in evidence when she asserted that the suitcases depicted in Exhibit 49 belonged to Khan and were packed. He claims "there was no evidence that the suitcases had anything in them, and no evidence that they were appellant's." He further argues that the prosecutor "had the means to determine to whom the suitcases belonged" but instead "manufactured the evidence and presented it to the jury in argument as if it were true." These arguments are not persuasive on the record before us.

During trial, the jury heard evidence that Khan's aunt told LAPD officers that Khan used the room in which the suitcases were found. Neither Khan nor Zambrano objected to the prosecutor's introduction of this hearsay evidence. The jury also heard

---

[7] We accordingly consider this claim of misconduct only as to Khan.

evidence that the laptop computer recovered from the same room had a single user account in the name "Abraham," which is Khan's first name, and contained photographs, Internet searches, and articles pertaining to Khan's gang, the Playboys. The prosecutor reasonably could infer from this evidence both that the room was used by Khan and that other items found in it also belonged to him. The fact that the room was not within Khan's residence—the garage of John's Telfair Avenue home—rendered even more reasonable the inference that he used suitcases while at his aunt's home in Orange County.

The prosecutor's suggestion that the suitcases were packed was equally reasonable. The suitcases were found in a room Khan "used" rather than permanently lived in. They were found roughly contemporaneously with other evidence suggestive of flight, namely Khan's change of appearance and Villa and Valle's use of a car associated with Khan, possession of his passport, and removal of unspecified property from the Telfair Avenue home. This evidence supported the inferences that Khan intended to flee and had packed suitcases as part of that endeavor. Moreover, both defendants explicitly argued that there were no "packed suitcases" indicative of flight by Khan. The prosecutor was entitled to respond to these claims, and her response was a fair one grounded in the evidence.

Even if the comments were improper, we agree with the trial court that they were not prejudicial. The evidence of Khan's involvement in the Hernandez murder was strong. Multiple eyewitnesses placed him and his distinctive car at the murder scene, which was in rival gang territory. Monterrosa testified that someone matching Khan's description "hit him up," which Del Rio opined was often a precursor to violent acts. James testified that Khan had a nine-millimeter gun that he kept in a lockbox, and that he saw the lockbox in the car on the day of the shooting. He further testified that Khan was acting slightly frantic, sought to get a tattoo immediately following the incident, and threatened him the following day. Evidence suggestive of flight reinforced rather than completed this evidence, and, as the trial court observed, the suitcase was "tangential at best" even with respect the alleged flight.

27

The trial court properly overruled Khan's objections and denied his motions for mistrial and new trial to the extent they relied upon the suitcase evidence.

### D. Lucky Article

#### 1. Background

One of the items Officer Kwon recovered from Khan's computer was an article regarding Los Angeles gangs. The article began with an anecdote about a 13-year-old girl who "was the innocent victim of a random gang shooting" while she put on makeup in her bedroom. It also purported to quote a member of the Playboys gang named Chino, who opined that "younger gang members don't know how to behave on the streets" and "mentioned Lucky, one of the dead Playboys, who was shot and killed on a street corner last summer while talking on a pay phone."[8] The article further quoted Chino as saying, "Nobody was there to watch his back, so this guy could just walk up to him from behind and shoot him." Kwon did not discuss the contents of the article during his testimony, and neither did any other witness.

Zambrano objected to the admission of the article, Exhibit 67, at the close of the prosecutor's case. He argued that it was "extremely inflammatory" because it discussed the unrelated murder of an innocent victim. He further claimed that it lacked probative value. Khan joined in these objections.

The court overruled the objections on the ground that the article was probative "for the impact that that it might have had on the reader. The conclusion could be that the reader was, in fact, Mr. Khan." The court further ruled, however, that "nothing in the article itself would be admissible for the truth of the matter asserted." The court offered to "reference that and let [the jury] know why it's being admitted and for the limited purpose, but I don't know if you want me to highlight that." Zambrano responded, "I would not." The court responded, "So there you go. This is kind of problematic. I'm not going to highlight it. I will if you want me to. I don't mean highlighted, but I would give

---

[8] It is unclear when the article was written. File data reported on the top of the document indicate only that it was last accessed on January 18, 2010.

28

a limiting instruction as to that particular item so it's clear it's not admitted for the truth of the matter asserted.  But over your objection, No. 67 will be admitted."

The article was not mentioned again until the prosecutor's rebuttal argument. After telling the jury "I'm not going to get into the facts of the article because most [sic] it is just an article written by someone out there," she made the following argument:

"This particular article addresses the Playboys gang.  And in it there is some talk about a gang member by the name of Lucky.  Why am I even bringing this up?

"Because what you will learn is that Lucky, a Playboy gang member, was out at a street corner on a pay phone when he was murdered in cold blood, this Playboy gang member.  And when he was murdered in cold blood, the other Playboy gang members were very upset because no one was out protecting one of their own.  They didn't protect their homeboy.  Okay?

"This individual, Lucky, who you didn't even hear about in the trial and it wasn't a story that was raised, comes in through the evidence taken off Khan's computer.

"Now, why do I talk about Lucky to you?  Because Lucky is very important to them. Lucky is tattooed on Detective [*sic*] Zambrano's arms, Lucky Bird. I'm going to show you later some photographs of this Lucky Bird.  But the fact that one of their own was murdered violently at a street corner on a pay phone meant when Khan and Zambrano drove by that pay phone that day, they seized an opportunity.  Okay?  And the reason why it would be a trophy tattoo is because Khan and Zambrano can then go back and say in the name of Lucky.  We got one too.  They got one of ours at a street corner on a pay phone; we got one also.  And that's the point.  That is what we're talking about when it comes to these gangs."

Zambrano objected after the argument but before the jury commenced deliberations.  He argued that it was improper for the prosecutor to refer to the article for its truth.  He further argued that her claims that "Lucky" and "Lucky Bird" were the same person were not supported by the evidence.  Zambrano's "biggest concern" was that "there [is] an additional motive being argued that once either Khan and/or Zambrano sees someone at the pay phone, they both know we're going to kill that guy on the pay phone,

29

which would impute knowledge as to Mr. Zambrano." He contended that such an argument had a "devastating" impact on him, and asked the court "to reconsider and not allow that one document about the article to go in with some sort of curative instruction," or grant a mistrial. Khan joined in Zambrano's objections and requests.

The court overruled the objection and denied defendants' motions for mistrial. The court explained: "Whether Lucky was actually shot at a phone booth is not as important as whether or not the defendants believed he was shot. But the article came in as basically part of the series of - - the activity that occurred shortly after the shooting. That's what it came in for. I don't think that - - I think that in terms of the inferences that [the prosecutor] is asking the jury to draw from that article, it's a fair comment. As you argued several things that you believed could be inferred from the evidence. Again, it's not as if they're being charged with it. They're being - - or there's any suggestion that they're responsible for the shooting. It's a suggestion that he was shot by an MS gang member.

"I don't think that's anything much more than what the gang expert already made clear that these two are enemies. And that, in fact, when they confront one another, it often results in violence and sometimes it escalates into somebody dying. So this is nothing beyond what they've already heard.

"The fact that there was a connection to a particular individual, I think, would be relevant in terms of what - - going to motive. Whether or not it actually was a MS - - somebody - - an MS gang member who shot him or not. The question is whether or not the defendant believed that was the case. So I'm not going to remove that particular item from the evidence and I'm not granting a mistrial, but your objection and motion are noted for the record."

Zambrano later moved for new trial on the ground that the prosecutor committed misconduct by "improperly using the facts of the article for the truth of the matter asserted." He further argued that the article only should have been admitted as to Khan, and that the prosecutor used the article to fill a gap in the case, namely that Zambrano was aware of and sought to aid and abet Khan's intention of killing Hernandez.

30

The court denied the motion. It "reiterate[d]" its opinion that "it was fair game to testify to this," and ruled that the comments have "to be viewed within the context of all the other evidence that came as motive relating to the active participation of both Mr. Zambrano and Mr. Khan and the Playboys." The court ruled, "I don't think it's so much admissible for the purpose of knowledge, and it wasn't argued as such. It was more a principle of motive and as far as why they would do something in that gang's territory in the nature it was done."

### 2. Analysis

Defendants argue that the prosecutor improperly "offered the article for its truth when the court had not admitted it for that purpose." They point specifically to the prosecutor's assertion that the jurors would "learn" from the article that Lucky was murdered at a pay phone, and her reference to "the facts of the article" that prefaced her discussion. They argue that her assertions about Lucky "could only be true if the information contained in the article was true," and that her use of the word "facts" told "the jurors that the article was proof that Lucky was killed and how he was murdered. Assuming these arguments properly are before us, we disagree.[9]

"Although defendant singles out words and phrases, or at most a few sentences, to demonstrate misconduct, we must view the statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) The trial court concluded that the overarching thrust of the argument was that defendants had a motive to murder Hernandez. This was not an abuse of discretion. Whether the statements in the article about Lucky were true or not, the presence of the article on Khan's computer reasonably supported the prosecutor's inference that Khan was familiar with its contents and accordingly killed Hernandez in pursuit of vengeance. Indeed, the prosecutor returned to this theme toward the conclusion of her rebuttal argument: "He chose to take a loaded

---

[9] Respondent suggests Zambrano is precluded from presenting these issues on appeal because he refused the court's earlier offer of a curative instruction. We do not decide whether Zambrano invited error; defendants' arguments fail on the merits in any event.

gun into rival territory.  He chose to pull that car around because he saw a man on a pay phone who was young and who was of an ethnic race that matched the description of the rivals, the MS.  And he saw the fact that that guy was on a pay phone was now redemption for whatever happened to Lucky."  Although her comments about the article may have been close to the line, the prosecutor did not introduce the article to prove its truth.  She did not ask the jury to do anything more than consider the article as one piece of a much bigger picture—a picture that in any event included other evidence from which it could be inferred that there was a member of the relatively small Playboys gang named Lucky Bird, with whom Zambrano was familiar to the point of tattooing the words "Lucky" and "Bird" on his arms.

Zambrano further contends the article "should have been admitted only as to Mr. Khan," because "the jury could only speculate that [he] was aware of the article, or the information that it contained, and that it provided him with a motive to kill Hernandez."  This argument is misplaced.  The trial court admitted the article "only for the impact that might have had on the reader," and expressly observed that "[t]he conclusion could be that the reader was, in fact, Mr. Khan."  It appears that Zambrano actually aims to challenge the prosecutor's suggestions that he and Khan shared the same retributive motive on the day of the murder.  His claim that there was no evidence he was aware of the article is true in a strict sense, but there was certainly evidence from which the jury could infer his awareness.  He and Khan lived together in the cramped quarters of a garage.  They belonged to the same gang for almost a decade.  The gang had only 80 members.  He had the word "Lucky" tattooed on his arm.

Even if there was an improper suggestion that Zambrano was aware of the contents of the article, it does not follow that the jury necessarily "used the article to conclude [Zambrano] was aware of how Lucky was murdered and therefore knew that Khan was going to kill Hernandez" and therefore found him guilty on impermissible grounds.  Whether Zambrano knew or shared Khan's precise motive was not the pertinent question for the jury; motive is not an element of murder.  The question was whether Zambrano knew Khan was going to commit an act of murder and knowingly took steps

32

intended to assist or encourage him in it. (See *People v. Chiu* (2014) 59 Cal.4th 155, 166-167 [describing elements of aiding and abetting first degree murder].) Ample evidence in the record supports an inference that he did. Del Rio testified that gang members are keenly aware of the boundaries of territories claimed by their gang and its rivals, and multiple witnesses testified that the intersection of James M. Wood and Westmoreland was within MS territory. Del Rio testified that the Playboys were feuding with MS, and that Playboys members frequently go into rival gang areas and shoot rival gang members when they are feuding with a particular gang. Monterrosa testified that the people in the Cadillac asked him where he was from, and Del Rio testified that there is an "expectation that violence is going to follow" when someone is "hit up," even if that person does not answer the query. James testified that a lockbox he knew housed a Beretta was at Zambrano's feet in the car, and multiple witnesses described the unusual way in which Khan "draped" a shirt over his arm when he exited the car mere feet from Zambrano. Even though there was no evidence that Khan and Zambrano explicitly discussed their intentions, Zambrano obeyed Khan's directive to get into the driver's seat without question, and kept watch in the rearview mirror in what Monterrosa described as a nervous and abnormal fashion. Even Monterrosa, who was not in a gang, discerned from the circumstances he observed that "something was going to happen." The article, improperly construed or not, was not the sine qua non of the case against Zambrano, and it is not reasonably probable that a result more favorable to him would have been reached had the prosecutor not made the arguments she did.

For all of these reasons, the court did not abuse its discretion in finding there was no misconduct and denying defendants' motions for mistrial and new trial.

33

**DISPOSITION**

The judgments of the trial court are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.